1  Lisa S. Kantor (SBN 110678)
2  *lkantor@kantorlaw.net*
   Timothy J. Rozelle (SBN 298332)
3  *trozelle@kantorlaw.net*
   KANTOR & KANTOR, LLP
4  19839 Nordhoff Street
   Northridge, CA 91324
5  Tel: (818) 886-2525; Fax: (818) 350-6272

6  Steven C. Dawson, (*admitted pro hac vice*)
   Arizona State Bar No. 006674
7  *sdawson@dawsonandrosenthal.com*
   Anita Rosenthal (*admitted pro hac vice*)
8  Arizona State Bar No. 006199
   *arosenthal@dawsonandrosenthal.com*
9  Sander R. Dawson (SBN 302431)
   *sander@dawsonandrosenthal.com*
10 Dawson & Rosenthal, P.C.
   25 Schnebly Hill Road
11 Sedona, AZ 86336
   Tel: (928) 282-3111; Fax: (928) 282-3126

12 Attorneys for Plaintiffs, Dual Diagnosis Treatment Center, Inc.,
13 Satya Health of California, Inc., Adeona Healthcare, Inc.,
   Sovereign Health of Florida, Inc., Sovereign Health of Phoenix,
14 Inc., Sovereign Health of Texas, Inc, Shreya Health of Florida,
   Inc., Shreya Health of Arizona, Inc., Vedanta Laboratories, Inc.

15             **UNITED STATES DISTRICT COURT**

16           **CENTRAL DISTRICT OF CALIFORNIA**

17 DUAL DIAGNOSIS TREATMENT          ) Case No.:
   CENTER, INC., a California corporation; )
18 SATYA HEALTH OF CALIFORNIA,       ) **COMPLAINT FOR**
   INC., a California corporation; ADEONA )
19 HEALTHCARE, INC., a California       ) **1. VIOLATION OF RICO, 18**
   corporation; SOVEREIGN HEALTH OF  )    **U.S.C. § 1962(c)**
20 FLORIDA, INC., a Delaware corporation; )
   SOVEREIGN HEALTH OF PHOENIX,      ) **2. CONSPIRACY TO VIOLATE**
21 INC., a Delaware corporation;         )    **RICO, 18 U.S.C. § 1962(d)**
   SOVEREIGN HEALTH OF TEXAS, INC.,  )
22 a Delaware corporation; SHREYA       )
   HEALTH OF FLORIDA, INC., a Florida  )
23 corporation; SHREYA HEALTH OF       ) **DEMAND FOR JURY TRIAL**
   ARIZONA, INC. an Arizona corporation, )
24 and VEDANTA LABORATORIES, INC., a )
   Delaware corporation,                )
25                                       )
                  Plaintiffs,            )
26                                       )
             vs.                         )
27                                       )
   HEALTH NET LIFE INSURANCE          )
28 COMPANY, a California corporation;    )

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

OPTUM SERVICES, INC., a Delaware corporation,

               Defendants.

## PLAINTIFFS

1.    Plaintiff Dual Diagnosis Treatment Center, Inc. ("Dual Diagnosis") is a corporation organized and existing under the laws of California. Dual Diagnosis does business as "Sovereign Health of California" and on occasion under other names as permitted by law. Until July 2018, Dual Diagnosis operated and maintained mental health and substance treatment facilities in California.

2.    Plaintiff Satya Health of California, Inc. ("Satya") is a corporation duly organized and existing under the laws of California. Satya does business as "Sovereign by the Sea II," and on occasion under other names as permitted by law. Until July 2018, Satya operated and maintained mental health treatment facilities in California, providing detoxification treatment, residential treatment (RTC), partial hospitalization program (PHP), intensive outpatient treatment (IOP), and outpatient treatment (OP). Satya was licensed to treat patients with mental health and/or substance use disorders.

3.    Plaintiff Adeona Healthcare, Inc. ("Adeona") is a corporation duly organized and existing under the laws of California. Adeona does business as "Sovereign Health Rancho/San Diego." Until July 2018, Adeona operated and maintained mental health treatment facilities in El Cajon California, providing RTC, PHP and IOP treatment for children ages 12 through 17. Adeona was licensed to treat patients with mental health and/or substance use disorders.

4.    Plaintiff Sovereign Health of Florida, Inc. ("Sovereign Florida") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Florida operated and maintained a mental health treatment facility in Fort Myers, Florida, providing detox, RTC, PHP, IOP and OP treatment. Sovereign Florida was licensed to treat patients with mental health and substance use disorders.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

5.    Plaintiff Sovereign Health of Phoenix, Inc. ("Sovereign Phoenix") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Phoenix operated and maintained a mental health facility in Chandler, Arizona providing RTC, PHP, IOP and OP treatment. Sovereign Phoenix was licensed to treat patients with mental health and/or substance use disorders.

6.    Plaintiff Sovereign Health of Texas, Inc. ("Sovereign Texas") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Texas operated and maintained a mental health facility in El Paso, Texas providing detoxification treatment, RTC, PHP and IOP. Sovereign Texas was licensed to treat patients with mental health and/or substance use disorders.

7.    Dual Diagnosis, Satya, Adeona, Sovereign Florida, Sovereign Phoenix and Sovereign Texas are sometimes referred to herein as "Sovereign facilities".

8.    Plaintiff Shreya Health of Florida, Inc. ("Shreya Florida") is a corporation duly organized and existing under the laws of Florida. Until July 2018, Shreya Florida was a billing entity for ancillary services rendered to patients treating at Sovereign Florida.

9.    Plaintiff Shreya Health of Arizona, Inc. ("Shreya Arizona") is a corporation duly organized and existing under the laws of Arizona. Until July 2018, Shreya Arizona was a billing entity for ancillary services provided to patients treating at Sovereign Phoenix.

10.    Vedanta Laboratories, Inc. ("Vedanta") is a corporation duly organized and existing under the laws of Delaware. Vedanta was authorized to provide laboratory services by COLA (formerly the Commission on Office Laboratory Accreditation), an accreditation organization for clinical laboratories under the Clinical Laboratory Improvement Amendments (CLIA) program. Until July 2018, Vedanta conducted laboratory testing services for the Sovereign facilities.

11.    Collectively plaintiffs are referred to as "Sovereign" or "Plaintiffs."

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

**DEFENDANTS**

12.     Defendant Health Net Life Insurance Company ("Health Net") is a California corporation with its principal place of business at 21281 Burbank Boulevard, Building B3, Woodland Hills, California. Health Net sells individual health insurance policies in California.

13.     Defendant Optum Services, Inc. ("Optum") is a Delaware corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota. Optum provides data, analytics, research, consulting, technology and managed services solutions to hospitals, physicians, health plans, governments and life sciences companies.

14.     Collectively Health Net and Optum are referred to as "Defendants."

**JURISDICTION AND VENUE**

15.     Jurisdiction is based on 18 U.S.C. §§1962, 1965 (Racketeer Influenced and Corrupt Organizations).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) and (c)(2). Health Net resides in this judicial district, Defendants do business in this judicial district, and much of the conduct that is the subject of this lawsuit occurred within this judicial district.

**NATURE OF THE CASE**

17.     This action arises from a fraudulent scheme created by Health Net and Optum, and aided by their agents and lawyers, to force Plaintiffs out of business so as to avoid paying over $65 million in legitimate mental health claims. This scheme included abuse of the insurance fraud investigation requirements under California law, bribery of competitors to obtain false information about Plaintiffs, and misrepresentations to law enforcement.

18.     Following the passage of the Affordance Care Act ("ACA"), Plaintiffs were one of the largest providers of mental health and substance use disorder services to

Health Net insureds. Health Net had offered a generous policy under the ACA but found itself in a death spiral (*i.e.* legitimate claims were much higher than premiums collected). To preserve an anticipated and life-saving merger with Centene Corporation, Health Net devised a scheme with Optum and others to falsely accuse Plaintiffs of fraud and force Plaintiffs out of business. At the time Health Net initiated this scheme, in late 2015 and early 2016, Health Net had no intent to honor its obligations under the policies issued to patients treated by Plaintiffs.

19.     As a result of Defendants' conduct, Plaintiffs closed their operations which were valued at appropriately $625,000,000. Plaintiffs now seek relief, including treble damages, attorney fees and costs.

20.     Through their conduct, as detailed below, Defendants conducted or participated, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity, or conspired to do so, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

## PLAINTIFFS WERE AWARD-WINNING
## MENTAL HEALTH PROVIDERS

21.     Plaintiffs offered specialized treatment for mental health, substance abuse and dual diagnosis disorders for adults and adolescents. In operation from 2009 through 2018, Plaintiffs had nine licensed treatment facilities in five states and employed approximately twelve hundred (1,200) people in the United States, including approximately sixty professionals with M.D. or PhD degrees. Plaintiffs have treated thousands of patients across the country, with an independently verified track record of success which far exceeds the industry average.

22.     Plaintiffs' California facilities were licensed by the California Department of Healthcare Services since 2009 for detoxification and residential treatment and by the California Department of Social Services, since 2012, for Mental Health Treatment.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Similarly, Plaintiffs' facilities in Arizona, Florida, and Texas were licensed by the appropriate agencies for treatment of mental health and substance abuse disorders.

23.    Plaintiffs' approach to addiction and mental health treatment was consistent with best practices in the industry. Its facilities earned The Gold Seal of Approval from The Joint Commission, an independent not-for-profit organization that is the nation's oldest and largest standard setting and accrediting body in health care. The National Alliance of Mental Illness recognized Sovereign for providing "The Gold Standard for Mental Health Treatment for patients in Orange County and throughout the country." Studies conducted in 2016 and 2017 by Harvard Medical School Affiliate, McLean Hospital, consistently found that Plaintiffs' residential patients were up to two times sicker than those typically admitted to other accredited behavioral healthcare providers and that Plaintiffs' programs produced clinical outcomes up to three times better than these comparable institutions.

24.    Plaintiffs were widely recognized behavioral health educators. Since 2015, the American Psychological Association authorized Plaintiffs and their staff to train licensed doctoral psychologists. The California Board of Behavioral Health Sciences, the California Association of Alcohol/Drug Educators, the National Association of Alcoholism and Drug Abuse Counselors and the Association for Psychology, Post-Doctoral and Internship Centers approved Plaintiffs to provide continued education to licensed professionals in the substance abuse field. The University of Southern California sent its Master of Social Work students to receive training at Sovereign facilities. Plaintiffs also provided continued education to lawyers for the substance abuse requirement of MCLE.

25.    In 2015, Plaintiffs received an offer from a venture capital firm to purchase their businesses for $625 million.

26.    At all relevant times, the Sovereign facilities and Vedanta were "out-of-network" health care providers with respect to Health Net. In other words, these entities did not contract with Health Net to provide mental health or substance use disorder

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

treatment to patients with Health Net health insurance at a discounted rate pursuant to what is commonly referred to as an "in-network" contract.

## HEALTH NET ENTERS THE ACA EXCHANGE WITH A DEFECTIVE PRODUCT AND INADEQUATE NETWORK

27. Effective 2014, the Affordable Care Act ("ACA") required health insurance policies to provide ten categories of "essential health benefits," including mental health and substance abuse treatment. 42 U.S.C. § 18022.

28. In 2014, Health Net began marketing health insurance policies under the ACA. At the time, the terms of Health Net's policies—designed to increase Health Net's market share—required payment to out-of-network mental health facility claims for inpatient, residential or outpatient treatment based on 75% or 100% of the billed amount. In contrast, most health insurance policies required payment to out-of-network mental health facility claims for inpatient, residential or outpatient treatment at a percentage of reasonable and customary charges, which resulted in a significantly lower reimbursement.

29. Health Net had great success under the ACA. In 2014 and 2015, Health Net saw dramatic increases in the number of policyholders. As disclosed in Health Net's SEC filings, enrollment in individual policies in Health Net's Western Region increased 188.7 percent from year-end 2013 to year-end 2014, from approximately 115,000 policyholders to 332,000 policyholders. In California alone, enrollment increased 137.0 percent, from approximately 100,000 policyholders to 237,000 policyholders. According to Health Net, this significant increase was primarily due to an increase in new individual policyholders under the ACA in California and Arizona.

30. Although Health Net was required by federal and California law to maintain an adequate network of contracted behavioral health (BH) and substance use disorder (SUD) treatment providers, Health Net's network of contracted, in-network providers for BH and SUD services was grossly inadequate, leaving many if not most of its insureds with no option but to go to out-of-network (OON) providers for such care.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    31.    In Health Net's advertisements, marketing materials, and in its directory

2    available through the Health Net website portal, Health Net represented and marketed

3    to consumers that its health plans have specific BH/SUD providers under contract and

4    within its network of providers available to those consumers enrolled in the Health Net

5    PPO Policies.

6    32.    After insureds enrolled in the new Health Net PPO Policies, many

7    discovered that their provider networks did not include the BH/SUD providers Health

8    Net had represented to be in-network providers, and that those provider networks were

9    much more limited than previously represented by Health Net.

10    33.    Health Net had a clear incentive to conceal its networks: As a result of these

11    practices, Health Net significantly increased its share of the California health plan

12    market, while offering inferior products and not paying the contractually and statutorily

13    mandated benefits. Although the plan was successful in dramatically increasing Health

14    Net's market share, it ultimately backfired.

15

16    **THE OPIOID CRISIS AND THE ACA LEAD TO AN INCREASE IN**

17    **MENTAL HEALTH CLAIMS**

18    34.    The ACA requirement that mental health be covered as an essential benefit

19    and Health Net's huge increase in the number of policyholders led to an even more

20    dramatic increase in the number and dollar amount of claims received by Health Net. In

21    its filings with the California Department of Insurance ("DOI"), Health Net disclosed

22    that in 2014 it earned $233.5 million in premiums for California policies but incurred

23    $345.5 million in claims, resulting in a loss of $112 million. In the following year, 2015,

24    Health Net earned $189 million in premiums, but incurred $473 million in claims,

25    resulting in a loss of $284 million.

26    35.    The increase in the dollar amount of claims related to the treatment of

27    substance abuse was particularly dramatic. According to Health Net's DOI filings, from

28    2014 to 2015 its *paid* substance abuse claims in California increased 1,577 percent. Out-

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

of-network substance abuse claims alone accounted for 42.7 percent of all of Health Net's claims in California in 2015 (*i.e.,* $202,385,210 out of a total of $473,970,047). The number of out-of-network behavioral health claims, which include substance use disorder claims, were over 9,000 percent greater in 2015 than in-network behavioral health claims. Health Net attributed this difference solely to the fact that out-of-network claims were required to be paid at a percentage of billed charges rather than at the much lower negotiated rate it paid to in-network providers.

36.    Michael Neidorff, CEO of Health Net's parent company, Centene Corporation, acknowledged in public comments during a Centene quarterly earnings call that the Health Net PPO policies were poorly designed and underpriced: "There were some design flaws that were just so obvious to those of us who have been doing it for a long time." "It was a bad design before. The state, everybody recognized it." The design flaws Neidorff and other Centene executives acknowledged included that the policies were underpriced and lacked: "restrictions on third-party premium payments, which were not included in the original 2016 offering"; requirements for co-payments and deductibles for out-of-network services; caps on maximum allowances; and incentives for members to use in-network providers instead of going OON – "Health Net had the most liberal PPO out there, which encouraged adverse selection." Neidorff explained that "basically out-of-network providers could do what they wanted and we are liable at a time for 75% of billed charges till they change their certificate of coverage."

37.    In an October 2016 quarterly earnings call, Neidorff explained that during the previous quarter, the company "recorded a premium deficiency reserve of approximately $300 million, due to unfavorable performance in some of Health Net's business operations." Neidorff assured the investment community that the unfavorable results had been dealt with through "benefit changes [that] included the first time inclusion of an out-of-network deductible for platinum and gold plans . . .; a significant increase in the out-of-network maximum out-of-pocket level . . .; the elimination of non-emerging out-of-state coverage and travel network access; the elimination of the default

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

rate of 75% of billed charges to out-of-network services that do not have a Medicare rate; the reduction of reimbursement for out-of-network physicians and other services . . .; and restrictions on third-party premium payments, which were not included in the original 2016 offering."

38.    During the same period of time, this country was experiencing an opioid crisis. Opioid overdoses accounted for more than 42,000 deaths in 2016, more than any previous year on record. An estimated 40% of opioid overdose deaths involved a prescription opioid. https://www.hhs.gov/opioids/about-the-epidemic/index.html

## HEALTH NET MERGES WITH CENTENE

39.    On July 2, 2015, Health Net announced that it had entered into a merger agreement with Centene under which Centene would acquire 100% of Health Net. In October 2015, Health Net's stockholders voted to approve the adoption of the merger agreement with Centene. When the deal was finalized, it was valued at $6.8 billion.

40.    In March 2016, the California DOI concluded its review of the merger and granted conditional approval, mandating that Centene keep Health Net's individual policies on Covered California (the exchange marketplace in California under the ACA), that Health Net ensure its networks of providers was adequate to meet the needs of its insureds, and that Health Net make efforts to improve its ratings on the "report card" issued to it by California Office of Patient Advocacy.

41.    Subsequent to the merger, Health Net's CEO received a golden parachute worth $54,000,000 and its CFO received a golden parachute worth $23,400,000.

42.    In July 2016, after the effective date of its merger with Health Net, Centene could not long avoid disclosing to its shareholders that Health Net had incurred $390 million in liabilities, which existed as of the March 24, 2016 merger date, but had not been properly accounted for and disclosed. At least $140 million of the undisclosed liabilities related to substance use disorder claims in California. The increased liabilities

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    were greater than Health Net's entire pre-tax annual earnings for any of the prior five

2    years.

3        43.    In a September 2016 quarterly earnings call, Neidorff acknowledged that

4    Centene knew about the various issues that led to the massive reserve deficiency when

5    it bought Health Net – "[w]e had done our homework" – but decided to purchase Health

6    Net despite this because "we knew what it would take to fix it. And that's just what we

7    have been doing, very methodically." Centene worked "very aggressive[ly] in fixing it,"

8    and Neidorff was "personally [] involved in" those efforts, as he explained during

9    quarterly earnings calls with the investment community. The efforts to "fix it" included,

10   among other things, implementing various "changes that we want" with respect to the

11   "plan design" and specifically "on the behavioral health" side, including, "[f]or example,

12   we can now charge 100% of Medicare for out-of-network versus 75% of billed charges."

13       44.    In numerous public statements, Neidorff admitted that Centene knew about

14   Health Net's liability prior to March 2016. Centene admitted in public filings that Health

15   Net's liability existed prior to the acquisition date.

16

17   **DEFENDANTS MISUSE THE SPECIAL INVESTIGATIONS UNIT**

18   **AND HIDE BEHIND ATTORNEY CLIENT PRIVILEGE TO CREATE FALSE**

19   **ALLEGATIONS AGAINST PLAINTIFFS**

20       45.    In late 2015 and early 2016, Health Net decided that it was not going to pay

21   the legitimate claims of Plaintiffs and other out of network substance use disorder

22   providers. Health Net decided that it could not pay those claims because to do so would

23   negatively affect its bottom line and threaten the anticipated merger with Centene.

24   Health Net devised a scheme to hide behind and use California Special Investigation

25   procedures to avoid its clear liability.  The scheme assured that claims would remain

26   "pended" and hidden and not be paid as required by the policies issued to Health Net

27   policyholders.

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

46.     Every insurer doing business in California must have a Special Investigation Unit ("SIU") to investigate possible fraudulent claims.  Ins. Code, § 1875.20; Cal. Code Reg., tit. 10, § 2698.31. The SIU is required to have written procedures, include a list of specific "red flags" to help detect suspected insurance fraud. Cal. Code Regs., tit. 10, § 2698.35. All fraud investigations must include (1) a thorough analysis of the claim that includes consideration of factors indicating fraud; (2) identification and interviews of potential witnesses; (3) preservation of documents and other evidence obtained; and (4) a concise and complete summary of the entire investigation which includes (a) the facts that caused the insurer to believe fraud might have occurred; (b) the suspected misrepresentations and who allegedly made them; (c) how the alleged misrepresentations are material and affect the claim; (d) the pertinent witnesses; (e) the documentation of the alleged misrepresentation; and (f) a statement as to whether the investigation is complete. Cal. Code Regs., tit. 10, § 2698.36, (a).

47.     Within sixty (60) days of a determination that a claim "appears to be fraudulent," the SIU is required to refer the matter to the DOI. Ins. Code, § 1872.4, (a). The referral must include the complete investigation. See Cal. Code Regs., tit. 10, § 2698.36, (a); Cal. Code Regs., tit. 10, § 2698.38. Each insurer is required to file a "complete, accurate, and truthful" SIU Annual Report, including the name(s), title(s) and contact information of the insurer's SIU personnel, a description of the insurer's methods and copies of written procedures for investigating fraud, a description of the organizational structure of the unit, and the total hours of employee time spent working on fraud investigations. Cal. Code Regs., tit. 10, § 2698.40.

48.     Defendants collaborated on a strategy to avoid paying the outstanding claims of Sovereign and other out-of-network substance abuse providers. Internal company emails reveal that at the beginning of January 2016, Health Net was looking for a way to quickly eliminate benefits being paid to OON BH providers. Defendants specifically targeted Plaintiffs as a "high volume" provider of treatment to Health Net insureds. In furtherance of the plan, Defendants devised a fraudulent scheme to misuse

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Health Net's SIU to advance a variety of false accusations against Plaintiffs. Defendants' plan involved various steps to achieve the financial savings they hoped for and had conveyed to shareholders.

49.    As part of the scheme devised by Defendants, in early 2016, Health Net instituted an SIU "audit" of Plaintiffs. Plaintiffs were placed on a SIU "watchlist." Defendants instructed claims personnel to re-route all claims from Plaintiffs to the SIU. As a result, Health Net stopped processing claims from Plaintiffs.

50.    Also in January 2016, Health Net entered into an agreement with Optum called the Order Schedule No. 24 to Master Services and Licenses Agreement (Behavioral Health Fraud Planning – Project OON Detox). This agreement was in furtherance of the Master Services and License Agreement between the parties dated June 29, 2012. This agreement was "for the specific purpose of handling . . . Project OON Detox." Pursuant to the agreement, Optum was "to assist Health Net in the development of a behavioral health fraud assessment and mitigation plan" and "provide a review, gap analysis, investigation to support litigation and process improvement recommendations for Health Net's behavioral health fraud operational process and policy." Among Optum's deliverables was "guidance for law enforcement request for information."

51.    At the same time, Health Net hired Ken Julian ("Julian"), a partner at Manatt, Phelps & Phillips, LLP ("Manatt"), to "direct" this SIU investigation. The Optum agreement specifically stated that it was made "at the direction of Health Net's legal counsel and all tasks herein described are the subject of attorney-client communications." At the time Health Net and Optum entered into the agreement described above there was no pending litigation between Health Net and Plaintiffs or any other out of network substance use or mental health disorder provider.

52.    As part of their scheme, Defendants ignored the statutory requirements that SIU investigations must follow. Instead, Defendants hid the SIU investigation behind the attorney client and attorney work product privileges. Defendants conducted the SIU

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

investigation in an unethical and fraudulent manner by, among other things, intimidating witnesses and misrepresenting that Defendants were part of law enforcement.

53.    In early 2016, Health Net sent a boiler plate form letter to more than 1,000 treatment centers designed to delay the processing of claims, delay the disclosure to shareholders of Health Net's financial losses and hide its blanket policy of refusing to pay certain claims. The letter bore the signature of Health Net's Director of SIU, Matthew Ciganek. The Ciganek letter imposed unlawful and onerous burdens on providers regarding claim submission, requesting extensive and unusual amounts of documentation in a short time frame (15 days). The letter also stated that Health Net was suspending payment on claims previously submitted and that Health Net was investigating alleged fraudulent practices.

54.    Health Net falsely alleged in the Ciganek letter that the failure of out of network mental health and substance use disorder treatment providers to collect the patients' deductibles, copayments or co-insurance could raise questions regarding false or fraudulent claims. Health Net's 2015 and 2016 ACA policies, however, were *coinsurance only policies* with zero deductible and zero copayments for out-of-network services. Moreover, it is impossible for treatment providers to determine co-insurance *before* an insurer adjudicates the claim. As a pretext for refusing to pay claims and to hide the blanket policies described above, the Ciganek letter placed an impossible burden on providers by refusing to adjudicate claims unless and until providers submitted proof of something (coinsurance) that can only be determined *after* claim adjudication. Neidorff publicly acknowledged that Health Net's ACA policies did not include the cost-sharing provisions (a co-payment or deductible for out-of-network services) of which Ciganek's letter demanded proof.

55.    The Ciganek letter also stated that eligibility under the Health Net policies was limited to individuals who "permanently reside" in a defined California area. There is no such requirement in the policies. Health Net had the authority to approve or deny enrollment applications, a process with which Plaintiffs had no involvement. Under

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

California law, in the event Health Net believed it had issued coverage on the basis of a material misrepresentation on the application, its remedy was to rescind coverage within two years. At no time during the relevant period has Health Net rescinded a single policy issued in California on the basis that the policyholder did not permanently reside in a defined California area. Defendants used these pretenses to support its fraudulent scheme and avoid paying valid claims by punishing providers and insureds for acting within the terms of Health Net's policies.

56.     The Ciganek letter also alleged that claim payment may not be appropriate if improper payments (such as payment of premiums) or other consideration has been made to patients "to induce procurement of services from your facility." Neither federal nor California law, however, prohibits third-party premium payment or cost sharing assistance to prospective patients. Additionally, Health Net's policies did not contain any provision prohibiting third party premium payments. In fact, Neidorff publicly acknowledged that the Health Net policies allowed third party premium payments and stated that one of the key changes Centene was making was placing "restrictions on third-party premium payments, which were not included in the original 2016 offering."

57.     Defendants endeavored to conceal the improper claims handling policies and reasons for non-payment of claims from members and providers for all OON BH/SUD claims under HN's California PPO IFP products. Defendants' claims handling guidelines, effective February 2016, instructed claims personnel to use specific denial or "disallow" codes for contesting claims of a certain type – ones being targeted by the SIU audit – rather than based on merit. For each denial/disallow code, the claims handling guidelines instructed personnel to use a specific boilerplate explanation to give the member or provider in letters explaining Health Net's basis for contesting the claim. The reasons given – both in the guidelines and in many of the letters sent to Plaintiffs explaining the basis for non-payment – did not reflect the actual basis for non-payment (the industry-wide dragnet on OON BH/SUD claims). Instead, members and providers (including Plaintiffs) were told that claims, which were in fact being contested based on

type, such as toxicology services for PPO products and all facility BH claims for PPO products, had not yet been processed because evidence of payment for member deductibles, co-insurance, and co-pays was needed. Neither evidence of such payments nor the payments themselves were required by the relevant policies.

58.    In addition to the vague and dishonest bases for non-payment used in letters to members and Plaintiffs, Health Net gave its claims personnel "talking points" with scripted responses to use when members and providers called in to inquire about the status and reasons for unpaid claims. These talking points were designed to mislead, conceal, and generally avoid disclosing to members and providers that their claims were pended because of the blanket SIU "audit" to which all OON BH/SUD claims were being subjected. The talking points included vague and dishonest answers to questions about the status of pending/unpaid claims and the reason such claims had not been processed or paid, instructing employees to respond to such inquiries by claiming that Health Net needed additional documents to process the claim, and that claims were being or would be processed upon receipt of the additional, pretextual information/documents.

59.    In reality, these claims were not being and would not be processed. Internal company emails explicitly instructed personnel to immediately stop processing all OON BH claims until further notice and focus solely on processing claims for lab and toxicology services – a substantial number of which were denied or underpaid. Health Net also developed a scheme to conceal Health Net's under-reserved substance use disorder treatment claims by introducing certain claims procedures that assured none of Plaintiffs' claims were paid.

60.    Health Net revised the claims handling manual guideline to specifically provide that Plaintiffs' claims were not paid at a percentage of the billed amount but, instead, at a significantly lower amount based on a Medicare percent conversion factor. To conceal the new procedures, neither policyholders nor providers were given notice of these changes in claims processing. Not paying the 75% or 100% reimbursement rate,

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

and instead using the Medicare rate, was a component of Defendants' fraudulent scheme to retroactively resolve the financial problems caused by their own "plan design flaws."

61.     Beginning in January 2016, Optum's involvement with Health Net's SIU departments expanded to the industry-wide fraud investigation into behavioral health and substance use disorder providers, a project that spanned from early January 2016 through the end of February 2017. Optum helped Health Net unlawfully change its prepayment review process. In addition, Optum developed the new reimbursement methodology for facility claims from Plaintiffs, described above, that ignored the required reimbursement, at 75% or 100% of billed charges pursuant to the applicable policies, and inappropriately relied instead on a percentage of Medicare reimbursement.

62.     In addition, Optum helped Health Net manufacture evidence to support their false accusations against Plaintiffs and provide post-hoc justification for Health Net's predetermined refusal to pay claims for reimbursement submitted by Plaintiffs and other drug abuse and behavioral health providers. Specifically, Health Net and Optum interviewed Plaintiffs' former employees. During those interviews, Health Net and Optum falsely accused Plaintiffs of a variety of unlawful, unethical and immoral conduct for the purpose of inducing witnesses to, essentially, gossip, including (1) opening facilities just to make money; (2) billing insurance companies for services that were not provided; (3) double billing for services provided; (4) using employees in India to create charts and medical records for patients; (5) pressuring employees to treat patients at a higher level of care than was medically indicated; (6) pressuring employees to alter patient diagnoses; (7) allowing patients to get pregnant in treatment and then kicking them out; and (8) "human trafficking" by trading patients.

63.     Health Net and Optum also exaggerated, mischaracterized, and falsely recorded the substance of interviews. For example, Health Net falsely recorded that at least one witness said Dr. Tonmoy Sharma, Plaintiffs' then-CEO, was a flight risk and that he had threatened a witness.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

64.   Defendants also spoke to other health insurance companies to "collaborate" on the false accusations Defendants were making against Plaintiffs. Defendants shared this false information in an effort to force Plaintiffs out of business by convincing other health insurance companies to stop paying claims submitted by Plaintiffs. Optum specifically participated in this "collaboration."

## FALSE PRESENTATIONS TO LAW ENFORCEMENT

65.   Health Net knew it was obligated to pay the outstanding claims but was determined not to pay these claims.  Health Net knew it would only be able to avoid such payment if it were able to discredit Plaintiffs and/or force them out of business. In late 2016, Health Net initiated multiple meetings with law enforcement and regulatory entities in an attempt to convince them to institute criminal proceedings against Plaintiffs.

66.   Julian participated in these meetings.

67.   Defendants met with the District Attorney in Los Angeles and Orange County, as well as the California Department of Insurance, all of whom refused to act on Defendants' allegations. Determined to have criminal proceedings initiated against Plaintiffs, Defendants created a Power Point presentation in which Defendants: falsely accused Plaintiffs of the manufactured conduct described above; suggested "targets" for criminal investigation; misrepresented the contents of interviews; and, suggested legal theories for criminal prosecution, including violations of: 18 U.S.C. § 24 — Definitions Relating To Federal Health Care Offense; 18 U.S.C. § 371 — Conspiracy To Commit Offense Or To Defraud United States; 18 U.S.C. § 1035 — False Statements Relating To Health Care Matters; 18 U.S.C. § 1341 — Frauds And Swindles; 18 U.S.C. § 1347 — Health Care Fraud; California Penal Code § 186.10 — Money Laundering Elements Violations Punishment Pleadings; California Penal Code § 487 - Grand Theft Defined; California Penal Code § 530.5 - Unauthorized Use Of Personal Identifying Information Of Another Person; California Penal Code § 550 - False Or Fraudulent Claims Or Statements Prohibited Acts.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

68.    Defendants gave this Power Point to the FBI and the U.S. Attorney in Orange County. The presentation was given by Julian – a former Assistant U.S. Attorney (AUSA), who worked in the same Orange County office as the AUSA in his audience during the presentation; SIU director, Daniel Kreitman – a former law enforcement officer; and Haley Fisher, a senior investigator for the SIU and also an attorney.

69.    Optum participated in this presentation. Lee Arian, VP of Advisory Services for Optum, previously worked as an assistant U.S. attorney. Optum contracted with former FBI agent, Mark Botello, to conduct various interviews of former Sovereign employees and patients. Mr. Botello was one of several investigators for Defendants who used improper interview techniques designed to elicit allegations about Sovereign to use in Defendants' presentation to authorities, and who reported in interview summaries that witnesses made damaging allegations about Sovereign that, according to later deposition testimony, misstated the witness statements. Botello's and other investigators' interview summaries were included in the presentation given to the FBI, U.S. Attorney's Office, and other authorities.

70.    Defendants knew or had reason to know that the quality of information they had obtained and presented to the FBI/authorities was insufficient to justify a search of plaintiffs' facilities and was insufficient to constitute a violation of the federal and state laws. In fact, Defendants never concluded Sovereign's operation was fraudulent, yet Defendants presented information to the FBI in support of fraud allegations that they knew was not accurate, well-founded, or supported by evidence. Defendants included allegations based on speculation without evidence, and presented certain evidence they knew was mere speculation. Defendants omitted any exculpatory evidence from the presentation and subsequent information shared with authorities.

71.    Defendants made the following blatantly false allegations against Plaintiffs, among others, telling these law enforcement entities: (a) Plaintiffs were treating Health Net patients and "dumping" them on the street when insurance coverage was denied; (b)

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Plaintiffs were about to close their facilities; (c) Dr. Tonmoy Sharma was about to flee the country; (d) Plaintiffs were using "cappers" and "runners" to solicit patients.

72.    At all times in their communications with the FBI and the U.S. Attorney's Office, Defendants presented themselves as nonpartisans relative to Plaintiffs. In fact, Health Net was actively involved in civil litigation with Plaintiffs in a lawsuit in which Plaintiffs alleged Defendants had wrongfully refused to pay approximately $65M in claims. Defendants never disclosed to the FBI or U.S. Attorney that Health Net was involved in contentious litigation with Plaintiffs, or that they were currently defending against claims of tens of millions of dollars brought by Plaintiffs.

73.    Julian has stated on the record that his firm was hired to "secure an indictment" against Plaintiffs.

74.    In support of their fraud allegations presented to authorities, Defendants relied on witness interviews of former Sovereign employees and patients—conducted by Optum and Health Net—that consisted of rumors and innuendo and which Defendants knew were speculative, unfounded, not credible, or not evidence of actual wrongdoing.  To support their allegations of "false billing," for example, Defendants cited the SIU interview of Pam Krueger, a former Sovereign employee, as evidence of "Sharma directing staff to bill for services not rendered." Defendants omitted the fact that Ms. Krueger told the investigator that she did not know this from personal knowledge but heard it from another person who was not cited in the presentation. Defendants cited Christina Khouie's SIU interview to support their allegation that Dr. Sharma was a "flight risk," omitting that Ms. Khouie had corrected the misstatement that Defendants presented to support this allegation. The other witness statements Defendants cited in their presentation suffered from similar omissions, comprising a record Defendants knew was misleading.

75.    Defendants knew the execution of a search warrant on plaintiffs' treatment facilities and threatened criminal prosecution would disrupt plaintiffs' operations and ongoing business.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

**THE RAID ON SOVEREIGN FACILITIES**

2    76.    On the morning of June 13, 2017, based on the misrepresentations

3    presented by Defendants, more than 100 armed agents from the FBI, U.S. Department

4    of Health and Human Services, IRS, DHCS, and several other agencies, simultaneously

5    executed search warrants at six Sovereign locations across southern California and the

6    home of Dr. Tonmoy Sharma. Mental health patients and others recovering from

7    substance abuse addiction, as well as their counselors, medical care providers, and

8    Sovereign employees, were physically escorted from their rehabilitative activities and

9    ordered to line up while government agents seized business and personal documents.

10   Agents, some with weapons drawn, immediately separated patients from employees,

11   confining employees to conference rooms and lobbies and forcing patients, many

12   suffering from PTSD and anxiety, to stand outside with armed agents. Patients and

13   employees were searched and interrogated; cell phones were confiscated.

14   77.    Agents and other individuals identifying themselves to patients as being

15   "with" the agents sowed discontent by repeatedly warning patients that Sovereign would

16   not be in business for long, encouraging patients to seek out alternative care facilities,

17   and even handing out business cards and brochures referring mental health patients to

18   competing mental health and substance abuse providers who are not licensed to provide

19   mental health treatment.

20   78.    The agents provided copies of search warrants for each location. The

21   warrants indicate that they were issued under seal, and that they were signed from 2:30

22   PM to 3:30 PM the day before the raid. The affidavit supporting each of the warrants,

23   which remains under seal, was not provided. Each of the warrants states that the agents

24   were authorized to seize only evidence of violations of certain federal statutes, including

25   the federal Wire Fraud statue (18 U.S.C. § 1343) – a statute expressly listed in Health

26   Net's cross-complaint – and the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b)—

27   a statute Health Net's fraud allegations appear to be patterned after (although Plaintiffs

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1  did not take Medicare or Medicaid) and relied upon in Health Net's motion for summary

2  adjudication of its fraud affirmative defense in the civil case pending in state court.

3      79.    Moreover, the warrants authorized seizure of records strikingly similar to

4  those sought by Health Net in its civil discovery requests, which were issued in March

5  2017. The warrants and Health Net requests, for example, authorized seizure of

6  documents and requested discovery (respectively) for the same temporal range, and the

7  categories of documents the government was authorized to seize track closely with the

8  allegations in Health Net's civil cross-complaint filed in February 2017 and the types of

9  records Health Net has sought through discovery.

10     80.    Upon information and belief, the FBI did not conduct an independent

11  investigation prior to conducting the raid, instead relying on the false and misleading

12  information provided by Defendants in deciding to conduct the raid and the application

13  and affidavits for the search warrant.

14     81.    In August 2017, Plaintiffs filed a motion to unseal the application and

15  affidavits supporting the search warrants relating to the raid, issued on June 12, 2017.

16  The motion was denied.

17                      **THE RESULT OF THE RAID**

18     82.    Defendants ultimately achieved their desired result: Over one hundred

19  patients left treatment on the day of the raid.

20     83.    Immediately thereafter, Plaintiffs' bank forced them to close their accounts.

21     84.    In furtherance of their goal to put Plaintiffs out of business, Defendants

22  arranged to have a reporter at the raid, who published articles in local newspapers,

23  repeating Defendants' false allegations. These false allegations were picked up and

24  repeated by various other news outlets, destroying Plaintiffs' reputation.

25     85.    The raid and attendant media coverage had predictable effects, traumatizing

26  Sovereign patients and employees and severely damaging Sovereign's reputation. In the

27  weeks following the raid, at least sixty-eight patients left Sovereign facilities specifically

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

as a result of the raid, while others declined to seek treatment at Sovereign. During the same period, numerous Sovereign employees resigned or sought medical leave due to anxiety caused by the search. A number of entities who had historically referred patients to Sovereign, including universities, hospitals, specialty care providers, specialists, and other treatment providers, suspended their referrals. Sovereign's primary bank, Bank of America, informed Sovereign that its accounts would be closed within 30 days. In some cases, Sovereign's operations were disrupted or slowed because clinical staff treating patients lacked necessary files and documents and had to secure replacements for their seized laptops and cell phones or find ways to work without them.

86.    The financial harms and damages inflicted on Plaintiffs' business were compounded by the substantial time and expense Plaintiffs expended in attempting to recover millions of dollars in reimbursement from Defendants for services Plaintiffs rendered on their insureds, and the substantial time and expense Plaintiffs expended in responding to Defendants' unreasonable demands for voluminous documents on claims they had already decided not to pay for pretextual reasons.

87.    Consequently, Plaintiffs ultimately could not afford to pay their employees and were forced to close all nine of their facilities and lay off nearly 1,200 employees.

## CA DOI COMMUNICATES WITH AND ORDERS HEALTH NET TO SHOW CAUSE

88.    In May 2016, the DOI wrote to Steven Sell, President of Health Net, about its "concerns" with the conduct of the SIU with respect to out-of-network substance use disorder providers.

89.    On June 10, 2016, Health Net responded to the DOI, falsely denying that it had done anything improperly.

90.    On July 12, 2016, Health Net wrote to the DOI, enclosing a binder of documents.

91.     On December 20, 2016, the DOI wrote again to Health Net, again challenging Health Net's conduct.

92.     On January 20, 2017, Health Net responded to the DOI. This letter contained false and misleading statements.

93.     Health Net has taken the position that the letters described above are privileged.

94.     On June 23, 2017, the DOI issued an Order to Show Cause ("OSC") to Health Net, stating that it had received hundreds of complaints from out-of-network substance use disorder providers about Health Net's handling of claims for treatment of Health Net policyholders. The OSC alleges that Health Net's refusal to honor the policy language, requiring reimbursement at 75% of billed charges, evidences unfair claims practices, violations of the Mental Health Parity Act, and unfair and/or deceptive act of practices in violation of California Insurance Code Section 790.03.

95.     Plaintiffs are informed and believe that Defendants misrepresented to the DOI that it was resolving the claims of the out-of-network substance use disorder treatment providers. In truth, Defendants have refused and failed to do so with respect to Plaintiffs and others who have rightfully exercised their rights, as assignees of Health Net policyholders, to pursue payment of the outstanding claims. In August 2017, the California DOI withdrew the OSC.

96.     On July 24, 2018, however, the DOI issued a new OSC alleging that Health Net's refusal to honor its policy language violates the law. The DOI stated that Health Net's referral of all claims to its SIU unit "directly upon receipt of the claims payment request, prior to performing a reasonable review of the claim" and placing providers "on an audit list and then require[ing them] to prove that they should be removed from the list before any payment was made" "resulted in illegitimate denials and delayed payment of claims" and "*is an unreasonable standard for the investigation and processing of claims.*"

97.     On January 6, 2019, Health Net settled with the DOI for $1,025,000.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1
2

### WIRE AND MAIL FRAUD

### 18 U.S.C. §§ 1341, 1343

3
4
5
6
7
8
9

98.    Defendants, by and through each other and their agents, engaged in a systematic and continuous scheme with the intent to defraud, deceive, and mislead Plaintiffs, and/or to fraudulently drive Plaintiffs out of business therefore depriving Plaintiffs of money. Defendants knowingly devised or knowingly participated in a scheme or artifice to defraud Plaintiffs or to deprive Plaintiffs of money or property by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. §§ 1341 and 1343.

10
11
12
13

99.    Defendants' false, misleading, and deceptive statements to Plaintiffs and others are contrary to public policy or fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society in violation of 18 U.S.C. §§ 1341, 1343.

14
15
16
17

100.   Defendants could foresee that the interstate wires and U.S. mail would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341, 1343.

18
19
20
21
22

101.   Defendants knew or could foresee that the interstate wires and U.S. mail would be used to transmit documents needed to facilitate the deprivation money owed to Plaintiffs, the improper conduct of the SIU investigation, the bribery of others, and the misrepresentations to law enforcement with the intent of putting Plaintiffs out of business so as to avoid paying money owed to Plaintiffs.

23
24
25
26
27
28

102.   Defendants acting singly and in concert, personally or through their agents, used the interstate wires or U.S. mail or caused the interstate wires or U.S. mail to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Plaintiffs, within the meaning of 18 U.S.C. §§ 1341, 1343.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

103.   It is not possible for Plaintiffs to plead with particularity all instances of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Defendants and other presently unknown individuals.

104.   By way of example, however, Defendants specifically used the interstate wires or U.S. mail or caused the interstate wires or U.S. mail to deliver each and every communication described in paragraph 108 that furthered or facilitated Defendants' scheme to defraud Plaintiffs.

105.   All of the communications described in paragraph 108 crossed interstate and international borders by reason of the technology used to transmit the communications.

106.   Each and every use of the interstate wires described in paragraph 108 was committed by Defendants with the specific intent to defraud Plaintiffs or to deprive Plaintiffs of money by means of false or fraudulent pretenses, representations, or promises. Defendants' acts of wire and mail fraud in violation of 18 U.S.C. §§ 1341, 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

107.   Plaintiffs were directly injured by their justifiable reliance on Defendants' fraudulent representations and omissions or by the justifiable reliance of third-parties on Defendants' fraudulent representations and omissions made pursuant to the above-described scheme in that, among other things, Plaintiffs continued to treat Health Net insureds and seek payment for that treatment and were eventually forced to close their treatment facility by reason of Defendants' false statements and omissions.

108.   As more generally set forth in paragraphs 27-75, 88-97, Plaintiffs allege that the following acts among others are acts of racketeering as defined by 18 U.S.C. § 1961.

| DATE | FROM | TO | PURPOSE |
|------|------|-----|---------|
| 6/1 – 6/3/15 | Gerry Calonge | Platini Mamvou | Savings if pay claims using Medicare rate rather than policy language |
| 6/1 – 6/3/15 | Gerry Calonge | Joseph Yasko | Change Claims Policy and Procedure re processing out of network behavior health claims. |
| 10/20/15 | Larry Tallman | Dena Maddox | Re: Behavioral Claims Recognizing spike in claims for out-of-network (OON) substance abuse facilities. Asking who is watching and what should be done |
| 10/20/15 | Dena Maddox | Larry Talman | Engage the SIU to deal with spike in claims for OON substance abuse facilities |
| 10/20/15 | Larry Tallman | Todd Graneto, Devan Cross, Cathy Hughes | Forward above |
| 10/21/15 | Devan Cross | Matthew Ciganek | Need to get system in place to deal with OON substance abuse claims. |
| 10/28/15 | Gerry Calonge | Derek Smith Cathy Hughes | Noting specifics of increase in claims beginning in 2014 leading to deficit to pay repricers. Listing 10 drivers of vendor fees for the last 3 months [redacted] |
| 10/30/15 | Gerry Calonge | Cathy Hughes Monina Alvarenga Sandy Tuttobene Christopher Hill Margo Carroll | Calendar Entry for 10/30/15 4-430 Attach: HNCA top 10 ONET July _ Sept2015.xlsx; For July, August and September 2015 we have discovered the following: 2,403 of 5,733 OON PPO claims were for Addiction Recovery/Toxicology Providers, representing $9.97M in billed charges and $8.7M in Allowed Charges. There are 462 Claims representing $5.1M in Billed and Allowed = 100% of Billed Charges. Purpose of meeting: 1. Identify if Participating Provider network has adequate providers to meet the needs of members? 2. Determine in what cases an authorization should be at Tier 2 (In Network) versus Tier 3 (Out of Network)? |

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

| | | | |
|---|---|---|---|
| | | | 3. Do we have reciprocity with MHN network for pricing? 4. MAA pricing application List of 12 months for Provider paid over $800K: [redacted] |
| 10/9/15 | Karen Wilson | Todd Graneto David Boss | "perfect storm" for rehab industry when the real estate market bottomed out and thousands of newly enrolled members with both ACA mandated benefits for SA and OON plan provisions came into play. First, OON reimbursement which is generally at or close to billed charges. The revenue is significantly greater than contracted rates would yield. Second, most of the other plans have dropped out of selling PPO on the AZ exchange for 2016. We have not, and we can expect that this has not gone unnoticed by the OON rehab community. Third, there is an unprecedented rate of admission into these rehabs. Noting that multiple SIU reports have been initiated |
| 10/9/15 | David Boss | Wei Luo | Explains why significant increases in AZ OON behavioral health claims. Working with SIU already and they are trying to sort out our options. |
| 11/3/15 | Catherine Chen (Corporate Actuarial) | Roy Garnica Todd Graneto David Boss Jae Shin | SIU progress with OON behavioral health claims |
| 11/3/15 | David Boss | Jae Shin Catherine Chen Wei Luo Roy Garnica Todd Graneto | Presentation re OON providers; progress of SIU and revision of claims manual |
| 10/28/15 | Matthew Ciganik | Patricia Buss | Hiring Optum to help with investigation |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

| 10/28/15 | Patria Buss | Haddad | Millions in cost avoidance if we put providers on review |
|---|---|---|---|
| 10/30/15 | Matthew Ciganek | SIU | Identifying largest volume providers including Sovereign Health Phoenix |
| 11/5/15 | Garibay | Ciganek | Closing lead because "low exposure" |
| 9/9/15 | Matthew Ciganek | Rodgers Wilson | Placing providers on prepayment review; contest all claims over $2,000 for medical records. Need to create way to identify claims; ask Optum to construct report |
| 9/29/15 | Matthew Ciganek | Rodgers Wilson | Pre-pay review more effective; need to create process for SIU; key considerations when implementing this process (tracking all claims that are reviewed, including calculating the savings associated with denied claims to demonstrate the value of this work, and some potential rationale for denying these types of claims). |
| 12/14/15 | Jae Shin | Sherman Card and others | Noting significant increase in behavioral health claims in 2015 for CA individual PPO. |
| 12/14/15 | Matthew Ciganek Garibay Maria Ramel Isaac Montez | Maria Ramel, Isaac Montez and others | Re *Drug and Alcohol Treatment Facilities – prepay review changes (attaches rehab facility prepay list)* After a meeting with executive leadership today, increase our efforts in this area; swap out some of the providers we currently have on prepay review to allow us to review more claims from these facilities. Plan: Remove certain low volume providers from prepay review. Look for other providers that have high volume: (redacted) Try to pend at least 50% of claims for all of the attached treatment facilities. Start all providers out at the std threshold of $2k. Pay attn to # |

| | | | |
|---|---|---|---|
| | | | of claims received from each provider on the list. *Don't think we've been receiving any records, so if that pattern holds true, these will be easy denials* |
| 12/15/15 | Humberto Garibay | | Satya Health put on prepayment review |
| 12/15/15 | Matthew Ciganek | SIU team | Re *New treatment facility/lab providers to put on prepay audit immediately* List from Finance of top paid facilities/labs. Half already on prepay, many of the remainder we didn't even know about, put on prepay audit immediately. These 19 providers need to be our top priority. *We need to do a bang up job of tracking the claims we pend for each of these, including when we deny these (either based on lack of records or Medical Director review).* If we're not able to review 50% of these, I need to know so we can remove other providers from audit or get more resources. |
| 12/16/15 | Ramel | Matthew Ciganek | Confirming implemented instructions above |
| 12/29/15 | Matthew Ciganek | Sherman Card | Re Fw: BH OON provider list for SIU reviews Attaching list of the 76 suspect providers that the SIU has on prepayment review. Based on the call earlier today, recommend end every claim (regardless of billed dollar) received from these providers. Recommending automated daily sweep to identify any claims in inventory from these providers and have the Claims dept pend them. |
| 12/29/15 | Sherman Card | Sotello | Requesting report for all claims regardless of status from July forward for all providers listed. Then on a daily basis, run a query of all new claims that come in so that can immediately pend them. |

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

| 12/29/15 | Sherman Card | Wolf | Needs report on Monday what has been processed, pended or in inventory; will have to pend those in inventory for SIU along with Medical Records once we get the daily report. |
|---|---|---|---|
| 12/21/15 | India-based team | Matthew Ciganek Humberto Garibay | Questions about 1230 claims to be pended. Asks information about these providers and why so many claims are pended. Instructs CTS team to pend every single claim > $2k for the following providers (redacted but MEDICAL CONCIERGE listed), request MRs and proof of members payment of copay/coinsurance amounts. Wants a report of all claims pended daily. |
| 12/20/15 | Dhinesh Kumar (India) | Matthew Ciganek | Attaching denied claim status for 12/29/15 |
| 12/29/15-12/30/15 | Sherman Card | Matthew Ciganek | Re BH OON provider list for SIU reviews Run report of all claims for providers in pend status; will be sweeping for the claims as they come in to be pended. Have to validate how to pend for proof of copay and coinsurance – not a pend previously done. |
| 12/30/15 | Matthew Ciganek | Sherman Card | Asking for report about all suspect providers from 1/1/15 to present, with all providers/claims included in one massive file. Wants to trend providers with greatest number of members. Attaching comprehensive list |
| 12/29/15-12/30/15 | Matthew Ciganek | Alesia Wolf | Pend all claims for medical records and evidence that the member paid any copay or coinsurance amount. |
| 12/2/15 | VJ | Degmetich Alesia Wolf | Discussed number of claims pending and types of claims. |
| 1-3/16 | Matthew Ciganek | 1.000 OON providers | Letters pending all claims and requesting medical records, proof of payment of deductible, copay and coinsurance and licenses |

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

| | | | |
|---|---|---|---|
| 01/07/16 | Garibay | | Added to SIU watchlist: Sov Health of PHX; Sov Health of FL |
| 1/12/16 | Margo Carroll | Gerry Calonge | Re Non-Medical Drug Detox Rehab Entities by Prov Cat.xlsx<br>Discusses new approach to paying facility claims using Medicare rates rather than policy language requiring percentage of billed. |
| 1/28/16 | Calonge Hughes Grigoryan | Grigoryan Hughes | Re MHN Contracted Rehab Providers-CA/AZ<br>Discussing availability of in-network providers |
| 2/1/16 | Armstrong Fukada Guerrero | | Purpose: Develop and coordinate distribution of targeted letter to members receiving OON SA services<br>Tell them what their choices are, including in network facilities, i.e. "Here's the number to call for other in network facilities because you have the right to in network services."<br>Refer them to provider directory.<br>Highlight network providers are certified licensed.<br>Highlight member benefits; less copay in network.<br>Include customer contact number. Larry Wong to provide specific phone number.<br>Sherman Card will provide members. |
| 1/27/16 | Isaac Montez | | Add Shreya Health of FL to audit list<br>We have come across an additional 5 providers that should probably be looked at as part of this issue. Case was created per Matthew request. |
| 2/11/16 | Garibay | | Add Shreya Health of FL and Satya Health of CA to audit list |
| 2/13/16 | Matthew Ciganek | Jennifer Moore | Setting up meeting with LA DA<br>Attach: Referral to LA DA – final 02.12.16 |
| 3/11/16 | Christina Khouie | Marc Botello | Interview report |

KANTOR & KANTOR LLP<br>19839 Nordhoff Street<br>Northridge, California 91324<br>(818) 886 2525

COMPLAINT

| 4/18/16 – 4/22/16 | Debbie McCulloch to Groshko | Groshko | Discussing lower rates being paid to OON facilities are leading to members not being able to get treatment; how to handle transfer to INN facility.  Also since HN has not paid for months some facilities cannot treatment patients.  Alert SIU |
| --- | --- | --- | --- |
| 05/12/16 | Cambria Day | | Dual Diagnosis Treatment Center, Inc added to audit list |
| 6/1/16 | Wolf | Varadharajan X Desikan Chaturvedi Robinson Seturaman Brickey Card Broaddus Kelly Kirkham Degmetich | Instructing to stop processing the OON BH Inpatient/Outpatient Claims effective immediately |
| 6/7/16 | Christina Khouie | Marc Botello | Interview report |
| 6/10/16 | Jennifer Moore | Janice Rocco, CDI | Conduct of SIU re OON BH providers |
| 6/17/16 | Varun Dhingra | Muehlbauer | Discussing roles of offshore and onshore team with respect to BH provider claims. |
| 6/17/16-6/20/16 | Jennifer Moore | Margo Carroll Brian Curley | Re Mid-Year review preparations – URGENT<br><br>Is the OON SA problem "getting better".  If you look at claims receipts alone in CA, might conclude it is getting better; amount of money we're paying out is getting better. Need to outline some risks on the current trend. If the payment methodology changes get overturned by the department, the trend goes the wrong way |
| 7/12/16 | Jennifer Moore | Janice Rocco | Binder of documents re investigation of Sovereign |
| 8/17/16 | Jennifer Turner | Corey Gerstenchlager | Recorded interview |
| 9/20/16 | Laura Wilbur, DHCS | Daniel Kreitman Haley Fisher | Re Fwd: Sovereign Health binders Discussing meeting in Sacramento week before with Optum and Health Net. Asking for six binders that |

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

| | | | |
|---|---|---|---|
| | | | were promised to be provided. Noting that they are working with California Department of Insurance. |
| 12/8/16 | Monica Pandis, FBI | Joe McNally, AUSA Ken Julian | Confirming that power point was provided by Health Net and Julian; setting up meeting for following week. |
| 10/12/16 | Pamela Krueger | Mark Trueblood | Investigation report and interview transcript |
| 12/8/16 | Monica Pandis | Haley Fisher Corey Gerstenschlager Liann Gohari John LeBlanc Daniel Kreitman | Re FW: Sovereign mtg with Joe & HN at Santa Ana USAO 12/14/16 2-3pm This is a meeting for Health Net SIU and Counsel to brief AUSA McNally. |
| 12/9/16 | Monica Pandis | Ken Julian Joseph McNally John LeBlanc Lisa LeGare Liann Gohari Daniel Kreitman | Re 12/14 2pm Sovereign meeting Sovereign meeting to present to AUSA McNally will be on 12/14 at 2pm to 3:30pm. Ken Julian response Thank you, Monica. We will be there |
| 12/12/16 | Corey Gerstenschlager | Huong Dang Lisa LeGare Daniel Kreitman Haley Fisher | Re: Sovereign Health Investigation Thanks for meeting; wants to deliver thumb drive. |
| 12/14/16 | Brooks | | Re UPDATE 12/13/16: Process for PPO IFP Off Exchange Out Of Network (OON) Claims Giving Q&A to personnel answering questions from providers. Please remember that you should never use the verbiage or relay to the caller about "fraud", Special Investigation Unit or SIU (shown below) as Health Net could be sued for defamation of character if no case of fraud is identified. QI. Why does my EOB say, "Please submit evidence of payments for member deductible/co-ins/co-pay, Compliant Medical Records and copy of the applicable license of the CA DHS Non-Medical Alcoholism/Drug Abuse treating facility or CLIA certificate for lab"? |

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

COMPLAINT

A1. "A request was submitted to you and to your provider for additional information in order to complete the processing of your claim. Evidence of co-payment or co-insurance would include a copy of your credit card transaction. a copy of the check you provided, or evidence of a withdrawal from your bank account."

Q2. Why do I need to send in evidence of my co-payment or co-insurance payment?

A2. "This information is needed in order to complete the processing of your claims."

Q 12. For any of the following questions, use the answer provided below:

· Why are you contesting all claims for more information

· Why are you doing this for very claim?

· Is this temporary or the new norm?

· Will this ever end?

· When will I get paid?

A 12. "At the beginning of 2016, Health Net amended its process for adjudicating claims for services related to substance abuse We are being more diligent in our review of these claims to ensure that we are paying claims that are appropriate. To make this determination, we request documentation to include medical records, evidence of licensure, and collection of member responsibility amounts. This is our new process, and we will be following this for the foreseeable future for each claim that we receive. .

Q 13. Can the claims be reprocessed to pay at 75 because Medicare has not allowable?

A13. "We will not make any adjustments to your claims. We have paid your claims in

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

accordance to the terms of our policy. If you are in disagreement, you can file an appeal."

Ql4. What specific date did HN start using this methodology?

Al4. "Health Net implemented the provision of the policy on January 1, 2016."

Q15. Given the new inpatient rates, will HN reprocess previously processed claims using the new rates?

A15. "Yes those claims will be adjusted."

Q16. Are you going to go back and reprocess the claims that were paid at the 75% and process at 7% and ask for a refund?

A16. "We have not made a determination on whether we will recoup any previously adjudicated claims."

Questions regarding the C DI reference that was providers

Ql7. Have you heard about or received a letter from the CDI regarding the hearing that took place around May 20th, 2016 stating that Health Net can't apply the new rates until 2017?

Al7. "Health Net has been in communications with the department. As of today. HN will continue to pay in accordance to the terms of our policy."

Ql8. Can our claims be reprocessed at the old rates because they have heard from CDI that Health Net can't apply the new rates until 2017 and has to apply the rates that were being paid prior to the investigation because providers were not notified?

Al8. "We will not make any adjustments to your claims. We have paid your claims in accordance to the terms of our policy. If you are in

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

| | | | disagreement, you can file an appeal." |
|---|---|---|---|
| 1/20/17 | Jennifer Moore | Janice Rocco | Conduct of SIU re OON BH providers |
| 1/30/17 | Corey Gerstenschlager | Monica Pandis | Re Powerpoint Attach: 12.07.2016 Sovereign Final.pdf |
| 1/30/17-3/7/17 | Haley Fisher | Monica Pandis | Incorrectly informing FBI that Sovereign is running a skeleton crew, but predominately shut down including major layoffs, no supervision and leaving all the members in the street. |
| 4/4/17 | Huong Dang | Cory Gerstenschalger Daniel Kreitman | Re Sovereign Health Investigation Referring meeting with investigators and asking for meeting in Orange County. Repeating AUSA McNally request for information about Sovereign |
| 1/8/19 | Paul Bonin | Ken Julian | Interview of Kelly Vickrey |
| 4/18/19 | Paul Bonin | Ken Julian | Interview of Susanne Drury |

# **OBSTRUCTION OF JUSTICE**

## **18 U.S.C. § 1512**

109. Health Net and Optum, by and through Julian and other agents, corruptly influenced an official proceeding or attempted to do so in violation of 18 U.S.C. § 1512(c).

110. Health Net's and Optum's corrupt influence of an official proceeding includes but is not limited to the Power Point presentation (*supra* ¶¶ 65-75) made to the FBI, the USAO, and potentially other federal law enforcement authorities in December 2016.

111. Health Net and Optum further unlawfully obstructed justice in violation of 18 U.S.C. § 1512(c) to the extent they made any false statements to or fraudulently concealed information from any federal law enforcement agency or official investigating Defendants' false allegations that Plaintiffs were engage in fraud.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

112.   It is not possible for Plaintiffs to plead with particularity all false statements and fraudulent omissions that constituted an obstruction of justice because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Defendants and other presently unknown individuals.

## BRIBERY

### Cal. Penal Code § 137

113.   As part of their scheme to drive Sovereign out of business, Optum, on behalf of Defendants, violated Cal. Penal Code § 137(a) by corruptly offering to pay or paying the claims of other out-of-network substance abuse providers if they provided testimony and other "evidence" to law enforcement in support of Defendants' false accusations against Plaintiffs. As noted above, Health Net had stopped paying the claims of over 1,000 out of network providers, and many were suffering financially as a result. Plaintiffs are informed and believe that these providers were bribed by Optum, on behalf of Defendants, to verify the false evidence gathered by Defendants against Sovereign.

## FIRST CAUSE OF ACTION

### VIOLATION OF RICO, 18 U.S.C. § 1962(c)

114.  Plaintiffs incorporate by reference all paragraphs alleged above.

### Enterprises

115.   Health Net, Optum, and Julian constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" and are referred to herein as "the HOJ Enterprise."

    a.    The members of the HOJ Enterprise shared the common purpose of (among other things) putting Plaintiffs out of business by defrauding Plaintiffs of money.

    b.    The members of the HOJ Enterprise are related in that Optum and Julian are agents of Health Net and have longstanding business relationships with each other.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      c.    The HOJ Enterprise possessed sufficient longevity for its members to carry out their purpose(s) in that the HOJ Enterprise succeeded in conducting an improper SIU investigation, bribing others to provide false evidence against Sovereign and making misrepresentations to law enforcement, resulting in forcing Sovereign out of business.

Health Net and Optum are each a "person" within the meaning of 18 U.S.C. § 1961(3) & 1962(c), who individually conducted, participated in, engage in, and operated and managed the affairs of the HOJ Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1), 1961 (5) and 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of racketeering described in paragraphs 21-113.

116.   In the alternative to paragraph 114, Optum constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that it is a "legal entity." Health Net is a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who conducted, participated in, engaged in, and operated and managed the affairs of Optum through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1), 1961 (5) and 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of racketeering described in paragraphs 21-113.

117.   In the alternative to paragraphs 114 and 115, Julian constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that he is an "individual." Health Net and Optum are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who conducted, participated in, engaged in, and operated and managed the affairs of Julian through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1), 1961 (5) and 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of racketeering described in paragraphs 21-113.

**Pattern of Racketeering**

118.   All of the acts of racketeering described in paragraphs 21-1134 were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud Plaintiffs; their common result was to defraud Plaintiffs; Health Net and Optum, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

119.   All of the acts of racketeering described in paragraphs 21-113 were continuous so as to form a pattern of racketeering activity in that Health Net and Optum, through their enterprise(s), engaged in the acts of racketeering from December 2015 through July 2018 (at a minimum) and/or the acts of racketeering pose a threat of indefinite duration (*see*, paragraphs 21-113).

**Causation / Injury**

120.   As a direct and proximate result of, and by reason of, the activities of the Health Net and Optum, and their conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, Plaintiffs suffered damages in that Plaintiffs were forced to close their operations as a result of Defendants' false representations, omissions, statements and promises. Plaintiffs are therefore entitled to recover threefold the damages they sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

## SECOND CAUSE OF ACTION
**CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)**

121.   Plaintiffs incorporate by reference all paragraphs alleged above.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   122.   As alleged in the First Cause of Action, Health Net violated 18 U.S.C. §

2   1962(c).

3   123.   With regard to Optum, the Second Cause of Action is alleged in the

4   alternative to the First Cause of Action.

5   124.   Optum conspired with Health Net to conduct or participate, directly or

6   indirectly, in the conduct of the affairs of the enterprises (*see* ¶¶ 114-117) through a

7   pattern of racketeering activity (*see* ¶¶ 118-119) in violation of 18 U.S.C. § 1962(d). In

8   particular, Optum intended to or agreed to further an endeavor of Health Net which, if

9   completed, would satisfy all of the elements of a substantive RICO criminal offense (18

10  U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal

11  endeavor.

12  125.   Plaintiffs were injured by Health Net's and/or Optum's overt acts that are

13  acts of racketeering or otherwise unlawful under the RICO statute, which included

14  (among other acts) acts of mail/wire fraud (as described in paragraphs 98-108),

15  obstruction of justice (as described in paragraphs 109-112), and bribery (as described in

16  paragraph 113) committed through the enterprises alleged in paragraphs 115-118.

17  126.   As a direct and proximate result of, and by reason of, the activities of Health

18  Net and Optum and their conduct in violation of 18 U.S.C. §1962(d), Plaintiffs were

19  injured in their business or property, within the meaning of 18 U.S.C. §1964(c).  Among

20  other things, Plaintiffs suffered damages in that Plaintiffs were forced to close their

21  operations as a result of Defendants' false representations, omissions, statements and

22  promises. Plaintiffs are therefore entitled to recover threefold the damages they sustained

23  together with the cost of the suit, including costs, reasonable attorneys' fees and

24  reasonable experts' fees.

25

26  **<u>REQUEST FOR RELIEF</u>**

27  WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1.   Damages in an amount to be determined at the time of trial but in excess of $625,000,000, plus interest, including prejudgment interest;

2.   Treble damages under RICO pursuant to 18 U.S.C. § 1964(c);

3.   Injunctive relief requiring Defendants to cease engaging in unlawful, unfair and fraudulent business acts and practices pursuant to 18 U.S.C. 1964(a);

4.   Reasonable attorney fees pursuant to 18 U.S.C. § 1964(c);

5.   Costs of suit incurred herein pursuant to 18 U.S.C. § 1964(c); and

6.   Such other and further relief as the Court deems just and proper.

Dated:  February 1, 2023       **KANTOR & KANTOR, LLP**
LISA S. KANTOR
TIMOTHY J. ROZELLE

**DAWSON & ROSENTHAL, P.C.**
STEVEN C. DAWSON
ANITA ROSENTHAL
SANDER DAWSON

By:___ */s/ Lisa S. Kantor*_____
Lisa S. Kantor,
Attorneys for Plaintiffs, Dual Diagnosis Treatment Center, Inc., Satya Health of California, Inc., Adeona Healthcare, Inc., Sovereign Health of Florida, Inc., Sovereign Health of Phoenix, Inc., Sovereign Health of Texas, Inc, Shreya Health of Florida, Inc., Shreya Health of Arizona, Inc., Vedanta Laboratories, Inc.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demand a trial by jury.

3

4

Dated:  February 1, 2023          **KANTOR & KANTOR, LLP**
                                   LISA S. KANTOR

5                                  TIMOTHY J. ROZELLE

6                                  **DAWSON & ROSENTHAL, P.C.**
                                   STEVEN C. DAWSON

7                                  ANITA ROSENTHAL
                                   SANDER DAWSON

8

9                                  By:___*/s/ Lisa S. Kantor*_____
                                        Lisa S. Kantor,

10                                      Attorneys for Plaintiffs, Dual Diagnosis
                                        Treatment Center, Inc., Satya Health of

11                                      California, Inc., Adeona Healthcare, Inc.,
                                        Sovereign Health of Florida, Inc., Sovereign

12                                      Health of Phoenix, Inc., Sovereign Health of
                                        Texas, Inc, Shreya Health of Florida, Inc.,

13                                      Shreya Health of Arizona, Inc., Vedanta
                                        Laboratories, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

COMPLAINT